| | |
|---|---|
| **G.S.**, a minor by and through her parents and natural guardians, **STEVEN & KRISTIN STOUT**, <br><br> *Plaintiff,* <br><br> *v.* <br><br> **CHARLOTTE-MECKLENBURG BOARD OF EDUCATION**, <br><br> *Defendant.* | Case No: <br><br> **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff G.S., a minor, by and through her parents and next friends, Mr. and Mrs. Stout, by and through counsel, and for her Verified Complaint against Defendant, hereby states as follows:

### INTRODUCTION

1. In *A Tale of Two Cities*, Charles Dickens began by contrasting how two different communities reacted to the same cataclysmic event—the French Revolution. G.S. and her family have experienced something similar, as they witnessed starkly different reactions to the horrific assassination of Charlie Kirk.

2. For G.S., the assassination of Charlie Kirk was horrifying, as she admired his boldness in advocating for and defending his Christian beliefs in the public square and his desire to engage those who disagreed with him in civil conversation.

3. In a desire to emulate Charlie Kirk's boldness for his faith, G.S. wanted to remind her classmates, friends, and others in the Ardrey Kell High School community that Charlie Kirk had received and was enjoying eternal life with his Savior, Jesus Christ, and to create a space where students could memorialize him.

4. After receiving permission from school officials to paint the Ardrey Kell High School spirit rock with a patriotic message related to Charlie Kirk, that's exactly what G.S. and two friends did. They painted the spirit rock with a heart, a United States

flag, the message "Freedom 1776," and a tribute to Charlie Kirk: "Live Like Kirk—John 11:25." Then they placed flowers in a vase at the base of the spirit rock.

5. For Defendant and its officials, the reaction to Charlie Kirk's assassination was quite different.

6. Some—including members of Defendant Charlotte-Mecklenburg Board of Education—used the assassination of Charlie Kirk as an opportunity to air their grievances against him, often by taking his statements out of context and misrepresenting them. For example, one member of the Defendant Charlotte-Mecklenburg Board of Education at the time posted this publicly on social media:



Posts   Photos   Reels

**Melissa Easley**
20m · 👥

Here is what I'm going to say about today. Political violence is not okay no matter what side you are on. That is the disappointing part and I am saddened that this was yet another political issue that caused a death.

But do not expect me to feel sorry, pitty or mournful for the man that has gone around saying I or my spouse are abominations, that we are mentally ill, that we don't deserve the same rights as everyone else.

Also

Remember according to Charlie Kirk "It's okay to sacrifice a few for your 2nd amendment rights" .

#gunsafety
#GunControlNow
#thoughtsandprayers
#guncontrol

She and other people of like mind made it quite clear that they did not respect him or mourn his assassination.

7.     This reaction set the tone for other District officials. Within hours after G.S. and her friends finished painting the Ardrey Kell High School spirit rock, Defendant's officials ordered her tribute to Charlie Kirk censored and painted over it.

8.     The next day, Defendant's officials publicly accused G.S. of a crime and a student conduct violation (vandalism), contacted law enforcement, and began cooperating with the criminal investigation.

9.     The day after that, the Monday (and first school day) after G.S. painted the spirit rock, Defendant's officials called her out of class, forced her to write out a statement summarizing her rock-painting efforts, and forced her to edit that statement to include details they believed to be important. And they did this without first advising G.S. of her constitutional rights in any criminal proceeding, including the right to remain silent and the right to have legal counsel.

10.    Later that same day, Defendant's officials called G.S. out of class again to interrogate her again about the statement they forced her to write. And they also forced her to reveal data from her cell phone, without first obtaining consent from her parents and again without advising G.S. of her constitutional rights in any criminal proceeding.

11.    The next evening, Defendant unveiled its *Revised Spirit Rock Speech Code*, restricting student expression on the Ardrey Kell High School spirit rock. Under the *Revised Spirit Rock Speech Code*, students could no longer express "political" or "religious messages" on the spirit rock, including any "religious, [sic] and/or political statements/symbols."

12.    Under the *Revised Spirit Rock Speech Code*, Defendant and its officials have unbridled discretion to restrict student expression, as they require all student messages on the spirit rock to "reflect positive school spirit and uphold inclusive values," to express "school-spirit and good news," and to be in "good taste"—without defining these terms in any way.

13. Within three days, Defendant and its officials knew that G.S. had not engaged in vandalism and quietly closed the criminal investigation against her. But they steadfastly refused to clear her name publicly, despite publicly accusing her of a crime before any investigation occurred and despite repeated entreaties from her parents (including entreaties to Defendant itself). Instead, they issued false public statements, claiming they had never investigated her for anything.

14. G.S. and her family fully recognize that not everyone shares their admiration for Charlie Kirk, but they also recognize that G.S. has the constitutionally protected right to express her views in a forum Defendant's officials created for student expression without those officials censoring her speech, launching bogus criminal investigations against her because of her speech with the obvious effect of chilling her and others from engaging in similar speech in the future, and imposing new viewpoint-based policies to restrict her speech in the future.

15. Defendant and its officials unconstitutionally censored G.S.'s speech that the First Amendment protects, retaliated against her for exercising her First Amendment rights, adopted new policies that violate her First Amendment rights, violated the unconstitutional conditions doctrine, ignored her Fourth and Fifth Amendment rights, and deprived her of due process and equal protection of the laws.

## Jurisdiction & Venue

16. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

18. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and

4

costs and attorneys' fees under 42 U.S.C. § 1988.

19. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district and division and all of the acts described in this Complaint occurred in this district and division.

PLAINTIFF

20. G.S., a minor, is a junior at Ardrey Kell High School and, at all times relevant to this Complaint, a resident of Mecklenburg County, North Carolina.

21. Steven and Kristin Stout are G.S.'s parents and natural guardians and, at all times relevant to this Complaint, residents of Mecklenburg County, North Carolina.

22. G.S. is a Christian and desires to share her religious views and faith-based views on issues of the day with her schoolmates.

23. Pursuant to her sincerely held religious beliefs, G.S. desires to express publicly positive and uplifting messages, like those that she painted on her school's spirit rock and that Defendant both censored and now bars her from expressing there.

DEFENDANT & ITS OFFICIALS

24. Defendant Charlotte-Mecklenburg Board of Education (Board) is the governing entity of the Charlotte-Mecklenburg School District (*a.k.a.*, Charlotte-Mecklenburg Schools or District). N.C. Gen. Stat. § 115C-40; *accord* CHARLOTTE-MECKLENBURG BD. OF EDUC. OPERATING PROCS. MANUAL § 1.1, a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 1.

25. The District is not a separate organization from Defendant and has no legal authority apart from that of Defendant. Ex. 1 § 1.1 n.1.

26. Defendant is also established, organized, and authorized to operate as a political subdivision of North Carolina. N.C. Gen. Stat. § 115C-40.

27. As a political subdivision, Defendant has the capacity to sue and be sued. N.C. Gen. Stat. § 115C-40.

5

28. Defendant is charged, *inter alia*, with the administration, operation, and supervision of all schools within the District, including Ardrey Kell High School. N.C. Gen. Stat. §§ 115C-36, 115C-40; Ex. 1 § 4.1.

29. Defendant is charged with formulating, adopting, implementing, and enforcing its policies, including the policies challenged here. N.C. Gen. Stat. §§ 115C-36, 115C-40; *accord* Board Policy B-BPP, a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 2.

30. Defendant is responsible for enacting and enforcing policies and practices related to student expression, including those challenged herein. N.C. Gen. Stat. §§ 115C-36; 115C-40; 115-47(1), (4); Ex. 1 §§ 4.1–4.2.

31. North Carolina statutes specifically empower Defendant to establish policies for the selection and implementation of discipline and student management on District campuses, including Ardrey Kell High School. N.C. Gen. Stat. §§ 115C-36; 115C-40; 115-47(1), (4); *accord* Board Policy B-DTY, a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 3; Board Policy B-SUPT, a true accurate, and complete copy of which is attached to this Complaint as Exhibit 4.

32. North Carolina statutes empower Defendant to select a superintendent, to define the superintendent's duties, and to remove a superintendent. N.C. Gen. Stat. § 115C-47(13), (15), (16); *accord* Ex. 3 at 1; Ex. 4 at 1–2.

33. North Carolina statutes empower Defendant to employ assistant superintendents. N.C. Gen. Stat. § 115-47(17).

34. Defendant has designated the superintendent as the individual responsible for implementing its policy in the daily operations of the District, for serving as its chief executive officer, and for the organization and administration of the District. Ex. 4 at 1–2.

35. Defendant has delegated broad authority to all District employees to ensure "the proper conduct and control of students while under the legal supervision of the

school." Ex. 4 at 3; *accord* Ex. 1 §§ 4.1–4.2.

36.   Defendant has delegated to the superintendent broad authority to create and implement policies and procedures "to carry out discipline in accordance with Board Policies and the general statutes of North Carolina." Ex. 4 at 3; *accord* Ex. 2 at 1; Ex. 1 §§ 4.1–4.2.

37.   Defendant has delegated to the superintendent the authority to implement the decisions of the school board, which includes broad power to manage and delegate student disciplinary matters to assistant superintendents, school police officials, and school principals, among others. Ex. 1 §§ 4.1–4.2.

38.   Defendant retains broad supervisory authority over the superintendent, the assistant superintendents, school police officials, the principal of each school in the District, and all other staff in the District. Ex. 1 § 4.1.

39.   Defendant was and is aware of the enforcement of certain District policies— including the District's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, and *Revised Spirit Rock Speech Code*—and their application to student speech.

40.   Defendant was and is aware that District officials enforced their *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* against G.S. when they painted over her message on the Ardrey Kell High School spirit rock and then publicly accused her of a crime.

41.   Defendant is and was aware that District officials adopted their *Revised Spirit Rock Speech Code*, which will prevent G.S. from expressing similar messages on the Ardrey Kell High School spirit rock in the future.

42.   District officials acted pursuant to Defendant's policy in promulgating and enforcing their *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* against G.S.

43.   District officials acted pursuant to Defendant's policy in promulgating and enforcing their *Revised Spirit Rock Speech Code* against G.S.

44. Defendant has ratified and implemented the application of the District's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* against G.S.

45. Defendant has ratified and implemented the *Revised Spirit Rock Speech Code* adopted and enforced by District officials.

46. Defendant is ultimately responsible for the implementation and enforcement of all school and District policies by District officials.

47. Ms. Crystal L. Hill is, and was at all times relevant to this Complaint, superintendent of Charlotte-Mecklenburg Schools.

48. Ms. Hill, as a policy maker with policy-making authority delegated to her from Defendant, is responsible for enacting, implementing, and enforcing District policies and their application to student speech.

49. Ms. Hill is responsible for the administration, interpretation, and oversight of certain District policies—including the District's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, and *Revised Spirit Rock Speech Code*—and their application to student speech.

50. Ms. Hill enforced the District's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* against G.S. when she approved Ms. Nichol's decision to accuse G.S. publicly of violating District policy and of committing a crime.

51. Ms. Hill oversees all District employees, other than Defendant, and all District offices, including all offices and officials identified here (aside from the Board).

52. Charlotte-Mecklenburg Schools Office of Staff & Community Engagement serves Ms. Hill and all District schools and departments.

53. Charlotte-Mecklenburg Schools Office of Staff & Community Engagement oversees Charlotte-Mecklenburg Schools Customer & Administrative Services.

54. Charlotte-Mecklenburg Schools Communications Office serves as the District's mouthpiece, controlling communications both within the District and to the public at large.

8

55. Ms. Ingrid Medlock is, and was at all times relevant to this Complaint, the Chief of Staff & Community Engagement for Charlotte-Mecklenburg Schools.

56. Ms. Medlock oversees Charlotte-Mecklenburg Schools Office of Staff & Community Engagement and all personnel that work in that office.

57. Ms. Medlock is, and was at all times relevant to this Complaint, the Interim Chief Communications Officer for the District.

58. Ms. Medlock oversees Charlotte-Mecklenburg Schools Communications Office.

59. Ms. Medlock reports to Ms. Hill.

60. Charlotte-Mecklenburg Schools Customer & Administrative Services Office focuses on delivering support and guidance for District families, among other duties.

61. Ms. Tasha Hall-Powell (Tyrelle) is, and was at all times relevant to this Complaint, the Executive Director of Customer and Administrative Services for the District.

62. Ms. Hall-Powell (Tyrelle) oversees Charlotte-Mecklenburg Schools Customer & Administrative Services Office and all personnel that work in that office.

63. Ms. Hall-Powell (Tyrelle) reports to Ms. Medlock.

64. Ms. Hill, Ms. Medlock, and Ms. Hall-Powell (Tyrelle) created and promulgated Defendant's *Revised Spirit Rock Speech Code*.

65. Mr. Ronnye Boone is, and was at all times relevant to this Complaint, the Executive Director of Internal & Executive Communications for the District.

66. Mr. Boone reports to Ms. Medlock.

67. Charlotte-Mecklenburg Schools Operations Office focuses on ensuring safety at all District schools, among other duties.

68. Charlotte-Mecklenburg Schools Operations Office oversees the Charlotte-Mecklenburg Schools Police Department.

69. Mr. Timothy Ivey is, and was at all times relevant to this Complaint, the Chief Operations Officer for the District.

70. Mr. Ivey oversees Charlotte-Mecklenburg Schools Operations Office and all

personnel that work in that office.

71. Mr. Ivey reports to Ms. Hill.

72. The Charlotte-Mecklenburg Schools Police Department is the District's state-authorized police agency, providing police and security services to all District campuses, properties, students, and personnel.

73. Mr. Jonathan Thomas is, and was at all times relevant to this Complaint, the chief of Charlotte-Mecklenburg Schools Police Department.

74. Mr. Thomas oversees the Charlotte-Mecklenburg Schools Police Department and all personnel that work in that office.

75. Mr. Thomas reports to Mr. Ivey.

76. Ms. Melissa Balknight is, and was at all times relevant to this Complaint, Deputy Superintendent for the District.

77. Ms. Balknight reports to Ms. Hill.

78. Ms. Christi Bostic is, and was at all times relevant to this Complaint, the Assistant Superintendent for High School Performance Area B for the District.

79. Ms. Bostic reports to Ms. Balknight.

80. Ms. Susan Nichols is, and was at all times relevant to this Complaint, the Principal of Ardrey Kell High School, a public school in the District and organized under the laws of North Carolina.

81. Ms. Nichols reports to Ms. Bostic.

82. Ms. Kelly Holden, Ms. Deborah Hitt, and Ms. Catherine Dugan are, and were at all times relevant to this Complaint, Assistant Principals at Ardrey Kell High School.

83. Ms. Holden, Ms. Hitt, and Ms. Dugan report to Ms. Nichols.

84. Ms. Hill, Mr. Ivey, Mr. Thomas, Ms. Balknight, Ms. Bostic, Ms. Nichols, Ms. Holden, Ms. Hitt, and Ms. Dugan, and the offices they represent, are responsible for enforcing certain District policies—including the District's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, and *Revised Spirit Rock Speech Code*—and applying

those policies to student speech, exercising authority Defendant delegated to them.

85.  Ms. Hill, Mr. Ivey, Mr. Thomas, Ms. Balknight, Ms. Bostic, Ms. Nichols, Ms. Holden, Ms. Hitt, and Ms. Dugan, and the offices they represent, enforced the District's *Unwritten Spirit Rock Speech Code* when they decided to censor G.S.'s message on the Ardrey Kell High School spirit rock by instructing District employees to paint over her message, exercising authority Defendant delegated to them.

86.  Ms. Hill, Mr. Ivey, Mr. Thomas, Ms. Balknight, Ms. Bostic, Ms. Nichols, Ms. Holden, Ms. Hitt, and Ms. Dugan, and the offices they represent, enforced the District's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* against G.S. when they publicly accused her of vandalism and of violating the District's Code of Student Conduct after she painted the Ardrey Kell High School spirit rock, investigated her for the same, and refused to clear her of these charges, exercising authority Defendant delegated to them.

87.  Ms. Hill, Mr. Ivey, Mr. Thomas, Ms. Balknight, Ms. Bostic, Ms. Nichols, Ms. Holden, Ms. Hitt, and Ms. Dugan, and the offices they represent, are responsible for enforcing Defendant's *Revised Spirit Rock Speech Code* at Ardrey Kell High School, exercising the authority Defendant delegated to them.

**FACTUAL BACKGROUND**

## I.   G.S. wanted to share her Christian views with classmates after the assassination of Charlie Kirk.

88.  G.S. is a high school junior currently enrolled at Ardrey Kell High School.

89.  G.S. is a Christian.

90.  As part of her Christian faith, G.S. believes that Jesus loves people and wants people to trust in Him to receive salvation.

91.  G.S.'s sincerely held religious beliefs compel her to share her religious beliefs and views with her classmates, friends, teachers, and others.

92. G.S.'s Christian faith governs the way she thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues, and it causes her to hold sincerely-held religious beliefs in these areas.

93. G.S.'s convictions concerning human nature, the purpose and meaning of life, and ethical standards that are to govern human conduct are drawn from the Bible.

94. For several years, G.S. admired the work of Charlie Kirk, founder of Turning Point USA.

95. G.S. admired Charlie Kirk's ability to defend his beliefs and values in public and to explain those beliefs and values to often hostile audiences.

96. G.S. primarily admired Charlie Kirk's boldness and clarity in explaining and defending in the public square the fact that Jesus Christ died and rose again to provide salvation to all people, the truth of the Scriptures, and the fact that obeying the Bible's teachings leads to human flourishing.

97. G.S. also admired Charlie Kirk's boldness and clarity in explaining how his religious beliefs influence his political views and defending both in the public square.

98. On September 10, 2025, Charlie Kirk was assassinated at Utah Valley University while participating in an outdoor rally where he engaged people of different views, explaining and defending the beliefs and values that he held dear.

99. G.S. was one of many young people across the country deeply saddened and profoundly moved by the assassination of Charlie Kirk.

100. For G.S., as for many other young people, the assassination of Charlie Kirk was heart-breaking. G.S. was distraught after seeing the assassination on social media as this was the first time she had ever witnessed someone being martyred for his faith, his beliefs, and his convictions.

101. In the days that followed Charlie Kirk's assassination, G.S. desired to express her admiration for him in a message to her classmates. In this way, she wanted to model the boldness for her faith that Charlie Kirk personified. She intended for this

message to honor God and serve as a memorial for Charlie Kirk, as Charlie Kirk was assassinated because of his beliefs and because of his faith in God.

## II. G.S. contacted school officials and received permission to share her message on the Ardrey Kell High School spirit rock.

### A. G.S. wanted to use the Ardrey Kell High School spirit rock as that is how classmates have communicated a wide variety of messages.

102. As she thought more about this desire, G.S. realized that painting a tribute to Charlie Kirk on the Ardrey Kell High School spirit rock would enable her to share her message with all of her classmates and serve as a memorial for Charlie Kirk.

103. The Ardrey Kell High School spirit rock is a large rock located in the lawn bordered by Ardrey Kell Road and the road that serves as the school's main entrance. In the picture of the school's campus below, the spirit rock is circled in yellow:



104. In the days following Charlie Kirk's assassination, G.S. scoured the Ardrey Kell High School website, looking for any policies that governed student expression on the spirit rock.

105. Despite all of her efforts, G.S. could find no publicly available, written policies governing student expression on the Ardrey Kell High School spirit rock.

106. But from her years at Ardrey Kell High School, G.S. knew that students regularly painted the spirit rock to express a wide variety of messages pursuant to an unwritten policy and practice.

107. G.S. has two older siblings who attended Ardrey Kell High School.

108. As a result, G.S. has been coming to the Ardrey Kell High School campus for more than just the years she has been a student there.

109. Throughout all her years coming to the Ardrey Kell High School campus, G.S. has seen a large number of messages, expressing a wide range of views and perspectives, painted on the school's spirit rock.

110. For example, in 2020, students who aligned with Black Lives Matter painted the Ardrey Kell High School spirit rock to express their personal and political views, painting the "black power" fist symbol along with the names of individuals they believed were the victims of police brutality, as shown below.



111. Defendant and its officials permitted the students to paint the Ardrey Kell High School spirit rock to express a Black Lives Matter message pursuant to their policy and practice.

112. In fact, when other students painted over the Black Lives Matter message, Defendant's officials held an emergency meeting to coordinate parents and staff to undo the painting over of the Black Lives Matter message.

113. But the students who wanted to express the Black Lives Matter message instead painted the spirit rock again to express the same message—this time with clearly political slogans—as shown below.



114. When school and District officials heard that the students who wanted to express a Black Lives Matter message had repainted the rock with their message, the officials praised the students for delivering a lesson in persistence.

115. Defendant and its officials permitted the students to repaint the Ardrey Kell High School spirit rock to express a Black Lives Matter message pursuant to their policy and practice.

116. Defendant and its officials thus took no action against the students who painted the Ardrey Kell High School spirit rock to express a Black Lives Matter message.

117. More recently, G.S. has seen messages painted on the Ardrey Kell High School spirit rock promoting the school's prom, teacher appreciation, Halloween, and a teacher-related fundraiser.

118. During the summer of 2025, students painted the Ardrey Kell High School spirit rock with the phrase, "United for Jamie," to express support for the school's recently-dismissed principal, as shown below.



119. At the beginning of the 2025–26 school year, the Ardrey Kell High School spirit rock was painted with a "Welcome Back" message.

120. Students also painted the Ardrey Kell High School spirit rock with, "Let's Go Panthers," to express support for the National Football League's Carolina Panthers.

121. In sum, G.S. knew from years of visiting the Ardrey Kell High School campus that students use the spirit rock to express a wide variety of messages—some related to school events, but many not, including many political or ideological messages.

122. In all the years that G.S. has been visiting the Ardrey Kell High School campus, she had never heard of any student being accused of vandalizing the spirit rock simply for painting a message on it.

123. As a result, G.S., Mr. Stout, and Mrs. Stout decided that G.S. should call the school office to find out what fees or restrictions applied to painting the spirit rock so that they could either comply with those rules or decide to find a different way to express their message about Charlie Kirk.

**B. School officials placed only one condition on G.S.—one with which she complied when she painted her message on the spirit rock.**

124. At approximately 2:28 p.m. on September 12, 2025, G.S. called the front office for Ardrey Kell High School and had a brief, approximately 44-second phone call with a female school employee. The records pertaining to this phone call, taken from G.S.'s cell phone, are attached to this Complaint as Exhibit 5.

125. During this conversation, G.S. asked if the school charged a fee for students who wanted to paint the Ardrey Kell High School spirit rock.

126. The school official told G.S. that there was no fee for painting the Ardrey Kell High School spirit rock.

127. The school official told G.S. that she could paint the Ardrey Kell High School spirit rock as long as her message did not violate the school's policies.

128. The school official told G.S. that there was only one rule governing student expression on the spirit rock. That is, students could not paint anything that included any profanity, any political messages (though Defendant's officials have permitted many such messages on the spirit rock), or any vulgarity.

129. The school official asked G.S. what message G.S. wanted to paint.

130. G.S. had not yet formulated the precise design she wanted to paint on the Ardrey Kell High School spirit rock.

131. But G.S. explained that she was thinking of "something USA themed" as well as "something for Charlie Kirk who recently passed."

132. The school official replied: "That would be very nice."

133. G.S. then thanked the school official, said goodbye, and ended the call.

134. Mr. and Mrs. Stout were present with G.S. during this entire phone call and heard the entire conversation.

135. After this call, G.S. naturally concluded that she was free to paint the Ardrey Kell High School spirit rock with her desired message, seeing as this school official had just authorized her to do so.

136. After this, G.S. and her parents purchased the paint needed to create her tribute to Charlie Kirk on the Ardrey Kell High School spirit rock.

137. At about 4:00 p.m. on September 13, 2025, G.S., her parents, and two friends who were also Ardrey Kell High School students came to campus and spent about two hours painting the spirit rock.

138. On one side of the spirit rock, they painted a United States flag. On another, they painted: "Freedom 1776." On another, they painted: "Live Like Kirk—John 11:25." And on another, they painted a heart. They also painted their first names on the rock. Pictures of their expression are below.






139. G.S. understood and intended the heart, the United States flag, and "Freedom 1776" to be patriotic messages acknowledging Charlie Kirk's love for the United States, not political messages.

140. G.S. understood and intended "Live Like Kirk" to express her admiration for Charlie Kirk, especially his desire to have respectful, meaningful conversations with others, including those with whom he disagreed, and his desire to seek the truth, to stand firm in his beliefs, and to be bold in his faith—not as political messages.

141. In G.S.'s mind, the most important component of her message was the reference to John 11:25 because she shares Charlie Kirk's strong faith in Jesus Christ.

142. John 11:25 refers to a passage in the Bible where Jesus says: "I am the resurrection and the life: he that believeth in Me, though he were dead, yet shall he live."

143. By including John 11:25 in her message, G.S. sought to express her religious beliefs to her classmates and to remind them that, although Charlie Kirk had been assassinated, he still lives eternally in heaven with his Lord and Savior and that they too can have that hope and confidence if they believe in Jesus Christ for salvation.

144. After painting the spirit rock, G.S. and her friends placed flowers in a vase at the base of the spirit rock, as a memorial for Charlie Kirk. They hoped that other students, who were also moved by his assassination, would follow their example and that this could become a place where students could express their grief over his assassination.

145. When painting the spirit rock with this message, G.S. and her friends did not cover any messages painted by students earlier that day.

**III. Within hours, Defendant and its officials censored G.S.'s message by painting over it.**

146. By 8:00 p.m., G.S. learned from social media that her message on the Ardrey Kell High School spirit rock regarding Charlie Kirk was no longer visible, having been

painted over with gray paint. The picture that G.S. saw on social media is below:



147. This was highly unusual, as messages on the spirit rock usually remain undisturbed for several weeks or even several months.

148. Later that evening, G.S. returned to the Ardrey Kell High School campus and saw a girl taking pictures of the now repainted spirit rock.

149. G.S. asked this girl if she had painted over G.S.'s message regarding Charlie Kirk.

150. This girl informed G.S. that Defendant and its officials had painted over G.S.'s message about Charlie Kirk.

151. This girl stated that her friend, who is on the Ardrey Kell High School Student Government, informed her of who had painted over G.S.'s message.

152. On information and belief, Defendant's employees, acting at its direction, painted over G.S.'s message on the spirit rock about Charlie Kirk.

153. By ordering G.S.'s message about Charlie Kirk to be painted over, Defendant

and its officials enforced its *Unwritten Spirit Rock Speech Code*, which gives them unbridled discretion to censor any messages painted on the spirit rock of which they disapproved.

154. By ordering G.S.'s message about Charlie Kirk to be painted over, Defendant and its officials exercised the unbridled discretion their *Unwritten Spirit Rock Speech Code* afforded them to censor student speech on the spirit rock.

155. After this, G.S. left campus. Neither she nor the friends who had helped her paint the spirit rock earlier that day painted the spirit rock after they finished their original message at about 6:00 p.m.

156. Later that night, G.S. learned, again from social media, that someone else had painted another Charlie Kirk message on the Ardrey Kell High School spirit rock, but this message was also soon covered up.

157. The next morning, September 14, 2025, G.S. saw that someone else had re-painted the Ardrey Kell High School spirit rock with messages like, "Be kind," and, "You are enough"—as shown below.



158. On information and belief, Defendant and its officials made no accusations against and took no action against any of the students who repainted the Ardrey Kell High School spirit rock after G.S. and her friends.

## IV. The next day, Defendant and its officials scrambled to begin revising the policies governing student speech on the Ardrey Kell High School spirit rock.

159. On the morning of September 14, 2025, Ms. Bostic sent a text message to principals in the District. A true, accurate, and complete copy of this text message, along with her explanatory email, is attached to this Complaint as Exhibit 6.

160. In this text message, Ms. Bostic asked if any principals had "spirit rock procedures in place" and asked that they "share them with me." Ex. 6 at 1.

161. Ms. Bostic also advised the principals: "If you don't, you may want to consider putting some in place in the near future." Ex. 6 at 1.

162. Ms. Bostic sent this text message in response to G.S.'s decision to paint the Ardrey Kell High School spirit rock with a tribute to Charlie Kirk.

163. On information and belief, Ms. Bostic sent this text message after consulting with Ms. Hill, Ms. Balknight, and Ms. Nichols.

164. Ms. Bostic sent this text message in an effort to assist Ms. Nichols in writing revised restrictions to regulate student expression on the Ardrey Kell High School spirit rock. Ex. 6 at 1.

165. When Ms. Bostic sent this text message, Ms. Hill, Ms. Balknight, Ms. Bostic, and Ms. Nichols knew that G.S. had violated no District policies when painting the Ardrey Kell High School spirit rock.

166. Ms. Bostic received no response to this text message. Ex. 6 at 1.

167. Nevertheless, Ms. Bostic continued to advise Ms. Nichols and other District officials on how to revise the policies governing student expression on the Ardrey Kell High School spirit rock.

**V. At the same time, Defendant and its officials publicly accused G.S. of a crime and investigated her for it.**

168. In the afternoon of September 14, 2025, Ms. Nichols sent all parents of Ardrey Kell High School students an electronic message via ParentSquare regarding G.S.'s expression on the spirit rock. A true, accurate, and complete copy of Ms. Nichol's electronic message is attached to this Complaint as Exhibit 7.

169. In this message, Ms. Nichols begins by acknowledging that the message is her own: "[T]his is Principal Nichols with an important message." Ex. 7 at 1.

170. In this message, Ms. Nichols stated: "We are aware that the spirit rock in front of our school was painted this weekend with a message that was not authorized or sponsored by the school or the district." Ex. 7 at 1.

171. The message Ms. Nichols referenced in this message was G.S.'s.

172. Contrary to Ms. Nichol's message, Defendant's *Unwritten Spirit Rock Speech Code* did not require students to get school or District authorization or sponsorship before painting the spirit rock, though G.S. did seek and receive authorization.

173. Ms. Nichols continued her message by telling all parents: "Acts like these are considered vandalism to school property and are in violation of the CMS Code of Student Conduct." Ex. 7 at 1.

174. Contrary to Ms. Nichols' statement, students who express messages on the Ardrey Kell High School spirit rock—including the students (aside from G.S. and her friends) responsible for the messages featured in this Complaint, *see supra* Compl. ¶¶ 109–21, 156–57—are not disciplined for vandalism or for violating the *CMS Code of Student Conduct*.

175. Defendant's *Vandalism Policy*, as outlined in the *CMS Code of Student Conduct*, defines "vandalism" as "willfully … damage[ing] or destroy[ing] property of another, including property belonging to the school or district…." A true, accurate, and complete copy of the *CMS Code of Student Conduct* is attached to this Complaint as Exhibit 8.

176. Students found guilty of vandalism under this *Vandalism Policy* can be held financially responsible for the damage inflicted, as can their parents. Ex. 8 at 13.

177. Students found guilty of vandalism under Defendant's *Vandalism Policy* can also face punishments up to long-term suspension. Ex. 8 at 13.

178. Ms. Nichols then told all parents: "Law enforcement has been contacted and we are cooperating with the investigation." Ex. 7 at 1.

179. Based on Ms. Nichols' statement, Ms. Nichols or District officials acting at her direction contacted Ms. Hill, Mr. Ivey, and Mr. Thomas, as well as Charlotte-Mecklenburg Schools Operations Office and Charlotte-Mecklenburg Schools Police Department, on September 13 or 14.

180. Based on Ms. Nichols' statement, Mr. Thomas and his department launched an investigation into G.S.'s painting of the spirit rock on September 13 or 14.

181. In sending this message, Ms. Nichols acted in conjunction with Ms. Holden, Ms. Hitt, and Ms. Dugan and with their approval.

182. In sending this message, Ms. Nichols acted in conjunction with, at the direction of, and with the approval of Ms. Hill, Mr. Ivey, Mr. Thomas, Ms. Balknight, and Ms. Bostic, as well as the offices they each represent and Defendant.

183. When G.S. read Ms. Nichols' statement, she became terrified that she would be punished for doing something that many other students had done before her and that school officials had authorized her to do.

184. G.S. feared that she would be disciplined or expelled for expressing her views on the Ardrey Hill High School spirit rock to the point that she went to her room and started crying.

185. G.S.'s fear and anxiety grew when she learned that Ms. Nichols' statement was being widely reported in the local news. Sample news articles recounting Defendant Nichols' statement are attached to this Complaint as Exhibit 9.

186. Due to Ms. Nichols' message, G.S. and the friends who helped her paint the

spirit rock were terrified about going to school the next day, fearful of how Defendant's officials would punish them.

187. After receiving Ms. Nichols' message and the threats of punishment (both from the school and from law enforcement) that it contained, any student of ordinary firmness would be less likely to express his or her views by painting the Ardrey Kell High School spirit rock.

188. After reading Ms. Nichols' message, G.S. sent Ms. Nichols an email. A true, accurate, and complete copy of G.S.'s email to Ms. Nichols is attached to this Complaint as Exhibit 10.

189. In this email, G.S. informed Ms. Nichols that G.S. had painted the Ardrey Kell High School spirit rock on Saturday, September 13. Ex. 10 at 1.

190. In this email, G.S. also informed Ms. Nichols that, before painting the spirit rock, G.S. had called the school office on Friday afternoon and received permission to paint the spirit rock. Ex. 10 at 1.

191. In this email, G.S. also denied Ms. Nichols' accusation that painting the spirit rock constituted vandalism, stating that she had acted in good faith. Ex. 10 at 1.

## VI. During the criminal investigation, Defendant and its officials compelled G.S. to write an account of her activities leading to the painting of the spirit rock, interrogated her, and searched her cell phone.

192. On Monday, September 15, 2025, G.S. went to school despite being terrified at how Ms. Nichols and other school officials would punish her for painting the spirit rock.

193. Because of Ms. Nichols' message to the entire school community the previous day, G.S. felt alienated, targeted, and vulnerable. She feared that someone in the school would interpret Ms. Nichols' message as permission to harass her and perhaps even beat her up, knowing it would not be difficult for students to tie her to the Charlie Kirk tribute since she and her friends had painted their names on the spirit rock.

194. G.S. felt particularly anxious because she knew that Ms. Nichols or school

officials acting at her direction had already contacted law enforcement, that a criminal investigation was underway, and that she faced discipline for allegedly vandalizing school property or violating the *CMS Code of Student Conduct*.

195. Yet at this point, Defendant and its officials knew or should have known that it is not vandalism or a violation of the *CMS Code of Student Conduct* for students to paint the Ardrey Kell High School spirit rock, as students have done so for years without anyone being disciplined and as school officials gave G.S. permission to do so in this instance. *See supra* Part II.

196. At this point, Defendant and its officials knew or should have known that there was no policy that prohibited students from painting the Ardrey Kell High School spirit rock as G.S. and her friends had done. *See supra* Part II.

197. Less than an hour after the school day began, the class phone in G.S.'s classroom rang, and G.S.'s teacher answered it.

198. The phone call alarmed G.S., as she suspected the call had something to do with her.

199. After the call ended, G.S.'s teacher announced to the entire class: "[G.S.], go to Student Services."

200. Student Services is where Ms. Nichols' office is located, along with the offices of Ms. Hitt, Ms. Holden, and Ms. Dugan.

201. By publicly telling G.S. to go to Student Services, G.S.'s teacher ordered her to report to the principal's office, and G.S.'s classmates understood this, embarrassing her further.

202. When G.S. reached Student Services, Ms. Hitt met her.

203. Ms. Hitt directed G.S. to go to a conference room.

204. Ms. Hitt instructed G.S. to sit at this conference table, in a seat where a notepad and pen were laying on the table.

205. Ms. Hitt then sat across the table from G.S.

26

206. Ms. Hitt ordered G.S. to write out her account of painting the spirit rock the prior Saturday, saying: "So you need to write your statement down of what occurred over the weekend regarding the rock."

207. At this point, G.S. was effectively in custody, as she could not leave this conference room without Ms. Hitt's consent.

208. Before ordering G.S. to write out this statement, neither Ms. Hitt nor any other District official informed G.S. that she could call her parents before writing this statement.

209. Before ordering G.S. to write out this statement, neither Ms. Hitt nor any other District official called Mr. or Mrs. Stout to secure their consent to mandating that G.S. write this statement.

210. Before ordering G.S. to write out this statement, Ms. Hitt did not advise G.S. (or her parents) of her constitutional rights, including her right to remain silent and her right to obtain legal counsel in any criminal proceedings.

211. The same day, District officials ordered the two friends of G.S. who helped her paint the spirit rock the prior Saturday to report to Student Services.

212. When those friends reported to Student Services, Ms. Holden instructed one and Ms. Dugan instructed the other to write a similar statement about the events related to painting the spirit rock on September 13.

213. At this point, these friends were effectively in custody, as they could not leave the area without the consent of Ms. Holden and Ms. Dugan.

214. Before ordering these students to write out their statements, neither Ms. Holden nor Ms. Dugan nor any other District official informed them that they could call their parents before writing their statements.

215. Before ordering these students to write out their statements, neither Ms. Holden nor Ms. Dugan nor any other District official called the students' parents to secure their consent to mandating that these students write these statements.

216. Before ordering G.S.'s friends to write out these statements, Ms. Holden and Ms. Dugan did not advise these students (or their parents) of their constitutional rights, including their right to remain silent and their right to obtain legal counsel in any criminal proceedings.

217. On information and belief, in ordering G.S. and her friends to write out these statements, Ms. Hitt, Ms. Holden, and Ms. Dugan acted after consulting with and at the direction of Ms. Hill, Ms. Balknight, Ms. Bostic, Ms. Nichols, Mr. Ivey, and Mr. Thomas.

218. On information and belief, in failing to advise G.S. and her friends of their constitutional rights in any criminal investigation, Ms. Hitt, Ms. Holden, and Ms. Dugan acted after consulting with and at the direction of Ms. Hill, Ms. Balknight, Ms. Bostic, Ms. Nichols, Mr. Ivey, and Mr. Thomas.

219. On information and belief, in ordering G.S. and her friends to write out these statements and failing to advise them of their constitutional rights, Ms. Hitt, Ms. Holden, and Ms. Dugan were participating in the law enforcement investigation Ms. Nichols had announced that she and her staff were cooperating with, an investigation based on the accusation that G.S. and her friends had committed the crime of vandalism. *See* Ex. 7 at 1.

220. G.S. and her two friends did not want to write out any statement regarding their efforts in painting the spirit rock.

221. But believing they had no choice but to obey the orders of Ms. Hitt, Ms. Holden, and Ms. Dugan, G.S. and her two friends wrote the mandated statements.

222. When G.S. wrote her mandated statement, she was so terrified that her hands began to shake such that she could hardly hold the pen and write straight.

223. After G.S. wrote out her mandated statement, Ms. Hitt reviewed it.

224. After Ms. Hitt reviewed G.S.'s mandated statement, she told G.S.: "You forgot to add what else you wrote." Then she handed G.S.'s statement back to her.

225. G.S. then re-read her statement and realized that, in her fright, she had forgotten to mention that her "Live Like Kirk" message also included "John 11:25."

226. At Ms. Hitt's direction, G.S. added a note to her statement to say that her message on the spirit rock was: "Live Like Kirk. John 11:25."

227. When Ms. Hitt reviewed G.S.'s updated statement, she commented in a strange, ominous tone of voice: "Yeah. I think that's the most important thing."

228. After this, Ms. Hitt told G.S. that she could return to class.

229. After leaving Student Services, G.S. could not stop herself from crying and spent some time in the bathroom until she regained her composure and could return to class.

230. From reading the statements of G.S. and her friends, Defendant and its officials knew or should have known that these students did not commit vandalism or violate the *CMS Code of Student Conduct*, as school officials had given them permission to paint it. Ex. 11 at 1 (recounting the school official responding to G.S.'s idea for painting the spirit rock by saying, "[T]hat would be very nice").

231. Thus, from reading the statements of G.S. and her friends, Defendant and its officials knew or should have known that they did not need to continue to investigate this matter in any way.

232. A few minutes after G.S. returned to class, Ms. Hitt came to the classroom and spoke with G.S.'s teacher.

233. G.S.'s teacher then called G.S. to the front of the classroom.

234. All teachers at Ardrey Kell High School require students to leave their phones in numbered slots at the front of each classroom.

235. When G.S. reached the front of the classroom, her teacher asked G.S. which slot contained her phone.

236. G.S. answered that her phone was in slot #9.

237. G.S.'s teacher then took G.S.'s phone from the slot and handed it to Ms. Hitt.

238. Ms. Hitt then instructed G.S. to return to Student Services so that Ms. Hitt could ask G.S. more questions.

239. This time, Ms. Hitt directed G.S. to sit in Ms. Holden's office at a table across from Ms. Holden and beside Ms. Hitt.

240. Thoroughly intimidated, G.S. began to cry once again.

241. Ms. Holden then called G.S.'s mother to ask if she could ask G.S. questions about G.S.'s role in painting the spirit rock.

242. In seeking this permission, Ms. Holden did not advise Mrs. Stout of her (or G.S.'s) constitutional rights, including their right to remain silent and their right to obtain legal counsel in any criminal proceedings.

243. G.S.'s mother granted Ms. Holden permission to ask G.S. questions.

244. In seeking this permission, Ms. Holden did not describe the nature of the questions she intended to ask G.S., and thus, Mrs. Stout did not understand the nature or scope of the interrogation Ms. Holden intended to conduct and could not offer meaningful consent.

245. After this call, Ms. Holden ordered G.S. to open her cell phone and show Ms. Holden the log of phone calls.

246. Ms. Holden had no justification for conducting this search, as she could have confirmed whether G.S. called the school office by looking at the school's own phone records.

247. Ms. Holden never asked Mrs. Stout for permission to search G.S.'s phone, and Mrs. Stout never consented to this.

248. When talking with Mrs. Stout, Ms. Holden never advised Mrs. Stout of G.S.'s constitutional rights in connection with this search of her cell phone while a criminal investigation was ongoing.

249. Ms. Holden never advised G.S. of her constitutional rights in connection with this search of her cell phone while a criminal investigation was ongoing.

250. Ms. Holden never advised G.S. that she could speak with her parents before complying with the order to open her cell phone and allow Ms. Holden and Ms. Hitt to search it.

251. Ms. Holden never advised G.S. or Mrs. Stout that she had a warrant to search G.S.'s cell phone.

252. Believing she had no choice but to comply with Ms. Holden's orders, G.S. showed Ms. Hitt and Ms. Holden the log of phone calls placed and received on her cell phone.

253. This log of phone calls showed that G.S. had called the school office on the afternoon of Friday, September 12. *See* Ex. 5.

254. After reviewing this log, Ms. Holden added a notation to the top of G.S.'s mandated statement, noting that G.S.'s phone showed that she had placed a 44-second phone call on September 12 at 2:28 p.m. A true, accurate, and complete copy of G.S.'s mandated statement, including Ms. Holden's handwritten notation, is attached to this Complaint as Exhibit 11.

255. Ms. Hitt and Ms. Holden then spent approximately ten to fifteen minutes quizzing G.S. about the contents of her mandated statement.

256. G.S. reminded Ms. Hitt and Ms. Holden that several groups had painted the spirit rock on September 13 after she and her friends finished painting their message and that she and her friends did not paint the rock after about 6:00 p.m. that day.

257. After this questioning ended, Ms. Hitt instructed G.S. to return to class.

258. On information and belief, in conducting these interrogations and searches, Ms. Hitt, Ms. Holden, and Ms. Dugan acted with the approval of and at the direction of Ms. Hill, Ms. Balknight, Ms. Bostic, Mr. Ivey, Mr. Thomas, and Ms. Nichols, the offices they represent, as well as Defendant.

259. On information and belief, in questioning G.S. and searching her cell phone, Ms. Hitt and Ms. Holden were participating in the law enforcement investigation Ms.

Nichols had announced that she and her staff were cooperating with, an investigation based on the accusation that G.S. and her friends had committed the crime of vandalism. *See* Ex. 7 at 1.

260. At about 9:00 a.m., Mr. and Mrs. Stout came to Ardrey Kell High School to check on G.S., having seen many of the vile messages on social media directed to G.S. and wanting to see how she was faring at school.

261. When Mr. and Mrs. Stout arrived at Ardrey Kell High School, a security guard greeted them. When he learned that they were there to see G.S., he smirked and remarked that G.S. had caused a great commotion that morning.

262. In saying this, this security guard referenced the reaction to G.S.'s efforts to paint the spirit rock with a tribute to Charlie Kirk.

263. On information and belief, this security guard reports to Mr. Thomas.

264. In reality, G.S. had done nothing that morning except attend classes and visit the school office as school officials directed her to do.

265. When Mr. and Mrs. Stout reached the school office, they met with Ms. Holden, and Mrs. Stout asked to see G.S., noting that she feared for G.S. had faced mistreatment at the hands of school officials.

266. Ms. Holden responded by saying that she hoped G.S. would learn from this experience and then describing how G.S. had been called to the school office and instructed to write out her statement.

267. Eventually, Mr. and Mrs. Stout were allowed to see G.S. but only in Ms. Holden's presence.

268. Mr. and Mrs. Stout could tell that G.S. was terrified, was struggling to maintain her composure, but was also reluctant to talk with them in Ms. Holden's presence—a natural reaction after facing multiple inquisitions that morning.

269. Mr. and Mrs. Stout then asked for a copy of the statement Defendant and its officials ordered G.S. to prepare, and Ms. Holden provided it, after redacting the

names of the friends who helped G.S. paint the spirit rock. *See* Ex. 11.

270. Later that afternoon, Ms. Nichols spoke with Mr. Stout, Mrs. Stout, and G.S. by phone.

271. In this conversation, Ms. Nichols acknowledged that she had received a copy of the statement that District officials ordered G.S. to prepare.

272. On information and belief, Ms. Nichols received a copy of G.S.'s mandated statement from Ms. Hitt, Ms. Holden, or Ms. Dugan.

273. Ms. Nichols then informed Mr. Stout, Mrs. Stout, and G.S. that she and school officials were "looking at what happened with the rock this weekend."

274. Ms. Nichols acknowledged that she had received G.S.'s September 14 email.

275. Ms. Nichols also admitted that she or another school official had checked the high school's phone system and verified that G.S. called the office on September 12.

276. Ms. Nichols then stated that there were no written policies or guidelines governing student expression on the Ardrey Kell High School spirit rock.

277. Ms. Nichols stated that she had been talking with Ms. Bostic about everything related to G.S.'s tribute to Charlie Kirk on the spirit rock.

278. Ms. Nichols was not sure who would make the final decision on whether G.S. would face any disciplinary action or when that decision would be made.

279. Ms. Nichols then tried to distance herself from the message she sent to the Ardrey Kell High School community.

280. For example, Ms. Nichols stated that she did not consider painting the rock to be vandalism.

281. However, Ms. Nichols' message on September 14 stated: "Acts like this are considered vandalism to school property and are in violation of the CMS Code of Student Conduct." Ex. 7 at 1.

282. Ms. Nichols also stated that she saw no reason to involve law enforcement in this matter.

283. However, Ms. Nichols' message on September 14 stated: "Law enforcement has been contacted and we are cooperating with the investigation." Ex. 7 at 1.

284. Ms. Nichols expressed a desire to resolve this matter within the next 24 to 48 hours, noting that she would directly contact G.S., Mr. Stout, and Mrs. Stout with the final decision.

285. Ms. Nichols also noted that District officials would create written policies governing student expression on the spirit rock.

## VII. Defendant and its officials next announced its *Revised Spirit Rock Speech Code* governing expression on the Ardrey Kell High School spirit rock.

286. On September 16, 2025, Charlotte-Mecklenburg Schools Administrative Services sent a message to all families of Ardrey Kell High School students. A true, accurate, and complete copy of Charlotte-Mecklenburg Schools Administrative Services message is attached to this Complaint as Exhibit 12.

287. Charlotte-Mecklenburg Schools Administrative Services sent this message to respond to the reaction of many individuals to G.S.'s message on the spirit rock. Ex. 12 at 1.

288. Charlotte-Mecklenburg Schools Administrative Services announced Defendant's *Revised Spirit Rock Speech Code*.

289. Defendant's *Spirit Rock Speech Code* includes limits on the messages that students can express there.

290. Defendant approved its *Revised Spirit Rock Speech Code* before Charlotte-Mecklenburg Schools Administrative Services sent the message communicating this speech code to families at Ardrey Kell High School.

291. Defendant, Ms. Hill, Ms. Balknight, Ms. Bostic, Mr. Ivey, Mr. Thomas, Ms. Nichols, Ms. Hitt, Ms. Holden, and Ms. Dugan (and the offices they represent) are responsible for enacting and enforcing Defendant's *Revised Spirit Rock Speech Code* at Ardrey Kell High School.

292. Defendant's *Revised Spirit Rock Speech Code* states: "Spirit rocks are **not to be used for personal, political, or religious messages**." Ex. 12 at 1 (boldface original); *accord* Ex. 12 at 3.

293. Defendant's *Revised Spirit Rock Speech Code* also states: "All messages should reflect **positive school spirit** and uphold the inclusive values of our school community." Ex. 12 at 1 (boldface original); *accord* Ex. 12 at 3.

294. Defendant's *Revised Spirit Rock Speech Code* does not define the terms "positive school spirit" or "inclusive values of our school community" or outline any factors that Defendant or its officials must use to decide if a particular message complies with their restrictions.

295. Thus, Defendant's *Revised Spirit Rock Speech Code*, specifically the mandate that messages "reflect positive school spirit and uphold inclusive values," grants Defendant and its officials unbridled discretion to restrict and censor student expression.

296. Charlotte-Mecklenburg Schools Administrative Services included with its message more provisions for Defendant's *Revised Spirit Rock Speech Code*. Ex. 12 at 2–3.

297. Defendant's *Revised Spirit Rock Speech Code* recognizes that the Ardrey Kell High School spirit rock is "student/family expression space for school-spirit and good news." Ex. 12 at 2.

298. Defendant's *Revised Spirit Rock Speech Code* does not define the terms "school-spirit" or "good news" or outline any factors that Defendant or its officials must use to decide if a particular message complies with their restrictions.

299. Thus, Defendant's *Revised Spirit Rock Speech Code*, specifically the mandate that messages express "school-spirit" or "good news," grants Defendant and its officials unbridled discretion to restrict and censor student expression.

300. Defendant's *Revised Spirit Rock Speech Code* also states: "What is painted on the Rock **MUST BE** in good taste and **MAY NOT** contain ... religious, and/or political statements/symbols." Ex. 12 at 3 (emphasis original).

301. Defendant's *Revised Spirit Rock Speech Code* does not define the terms "good taste" or outline any factors that Defendant or its officials must use to decide if a particular message complies with their restrictions.

302. Thus, Defendant's *Revised Spirit Rock Speech Code*, specifically the mandate that messages be in "good taste," grants Defendant and its officials unbridled discretion to restrict and censor student expression.

303. Under Defendant's *Revised Spirit Rock Speech Code*, if students violate these restrictions with their messages, then District officials will repaint the spirit rock to censor the speech. Ex. 12 at 3.

304. If students violate Defendant's *Revised Spirit Rock Speech Code*, they expose themselves to discipline under the "CMS Code of Student Conduct." Ex. 12 at 3.

305. The *CMS Code of Student Conduct* specifies that students could face punishments up to expulsion if they violate Defendant's *Revised Spirit Rock Speech Code*. Ex. 8 at 9–10.

306. If it were not for Defendant's *Revised Spirit Rock Speech Code* and their threats to enforce it (as demonstrated by the way they censored G.S.), G.S. would immediately seek to express her views—including her religious views—on the spirit rock, such as the same message regarding Charlie Kirk and associated scripture verse.

307. G.S. is refraining from expressing her views on the Ardrey Kell High School spirit rock because of Defendant's *Revised Spirit Rock Speech Code* and her knowledge that Defendant and its officials will enforce this speech code against her, as shown by the way they censored her speech and threatened her with both criminal and disciplinary sanctions.

## VIII. For weeks, Defendant and its officials refused to clear G.S.'s name, even after the baseless criminal investigation concluded.

308. On September 16, 2025, Mr. Stout and Ms. Nichols spoke by phone for no more than ten minutes or so.

309. During this phone call, Ms. Nichols told Mr. Stout that she had closed her criminal investigation into G.S.'s efforts to paint the spirit rock.

310. During this phone call, Ms. Nichols also told Mr. Stout that she would take no disciplinary action against G.S. or impose any consequences on her related to her efforts to paint the spirit rock.

311. However, Ms. Nichols said nothing during this call about issuing a statement exonerating G.S. from Defendant's very public accusations of vandalizing school property and violating the *CMS Code of Student Conduct* by painting the spirit rock with the tribute to Charlie Kirk.

312. On September 17, 2025, Ms. Nichols spoke by phone with Mr. Stout, Mrs. Stout, and G.S.

313. During this call, Mrs. Stout referenced how District officials had just issued a statement with the new policies governing student expression on the spirit rock, referring to Defendant's *Revised Spirit Rock Speech Code*.

314. At the same time, Mrs. Stout explained (a) how she, Mr. Stout, and G.S. were disappointed that District officials had not also issued a statement exonerating G.S. from their very public accusations of vandalizing school property and violating the *CMS Code of Student Conduct* by painting the spirit rock with the tribute to Charlie Kirk and (b) how they wanted District officials to issue such a statement.

315. Mrs. Stout and Mr. Stout asked Ms. Nichols to send out a message to the Ardrey Kell High School community stating that G.S. and her friends were cleared of any wrongdoing, that there was no vandalism, and that they had approval to paint the spirit rock with the Charlie Kirk tribute.

316. Mrs. Stout and Mr. Stout explained to Ms. Nichols how G.S. had seen messages on social media alienating her and celebrating the fact that, based on statements from Defendant's officials, G.S. would be criminally prosecuted for painting the spirit rock with the Charlie Kirk tribute.

317. G.S. began seeing these messages on social media ostracizing her and celebrating the fact that, based on statements from Defendant's officials, she would be criminally prosecuted and disciplined under the *CMS Code of Student Conduct* for painting the spirit rock with the Charlie Kirk tribute shortly after Ms. Nichols' September 14 message to the Ardrey Kell High School community (*i.e.*, Ex. 7), and those messages and similar harassment continued for approximately six weeks.

318. Some of these social media messages came from students at Ardrey Kell High School, and some came from people outside that community who had apparently read about the accusations from Defendant's officials from news accounts of the situation.

319. Many of these social media messages urged school officials to prosecute her, insisted she should be imprisoned for years, and labeled G.S. and her friends "racist thugs." The most jarring messages said things like: "Die like Kirk."

320. G.S. has been also unfollowed by myriad followers on social media because of the accusations Defendant and its officials lodged against her.

321. In addition, because of the accusations Defendant and its officials made against her publicly, G.S. has become estranged from friends at school and elsewhere. Right after these accusations, her best friends, with whom she had been close for years, wanted nothing to do with her and stopped socializing with her. In most of her classes, she sat alone, with fellow students alienating her. As recently as just before Thanksgiving, students have labeled her as the girl that painted the rock.

322. The stress created by the accusations from Defendant and its officials, their investigation, the social media attacks, and the alienation from her friends exacerbated the symptoms of G.S.'s Crohn's Disease, creating severe stomach issues for her.

323. Ms. Nichols promised to relay these concerns and requests to Ms. Bostic and other District officials on the evening of September 17, 2025.

324. Ms. Nichols stated that all District officials had closed all criminal investigations into G.S.'s efforts to paint the spirit rock and agreed not to take any disciplinary

action against G.S. related to these efforts.

325. Ms. Nichols admitted that, though the investigation was closed, there was not closure for the families involved, including G.S.'s family.

326. Ms. Nichols expressed repeatedly that she was sorry for all that G.S. was going through as a result of the actions of Defendant and its officials.

327. Ms. Nichols admitted that her message to Ardrey Kell High School families on September 14 (*i.e.*, Ex. 7) about how G.S.'s efforts to paint the spirit rock constituted vandalism and a violation of the *CMS Code of Student Conduct* to the point that she and other District officials had contacted law enforcement and were cooperating with the criminal investigation created fear in the school community.

328. On the morning of September 18, 2025, Ms. Nichols sent Mr. and Mrs. Stout an email stating that she had relayed their concerns and requests to Ms. Bostic. A true, accurate, and complete copy of Ms. Nichols' email of September 18, 2025 is attached to this Complaint as Exhibit 13.

329. On September 19, 2025, having heard nothing from Ms. Bostic and nothing more from Ms. Nichols, Mrs. Stout sent Ms. Hill an email through the District's "Contact Me" portal reiterating the concerns and requests she, Mr. Stout, and G.S. had expressed to Ms. Nichols. A true, accurate, and complete copy of Mrs. Stout's email to Ms. Hill on September 19, 2025 (though inadvertently misdated as September 19, 2026) is attached to this Complaint as Exhibit 14.

330. In this email, Mrs. Stout again requested that District officials issue a statement clearing G.S. of any wrongdoing, informing the Ardrey Kell High School community that G.S. and her friends had permission to paint the spirit rock, and that their actions were not vandalism or violations of the *CMS Code of Student Conduct*. Ex. 14 at 1.

331. Mrs. Stout also requested that District officials issue this statement by the end of the day, seeing as they had so swiftly issued new policies governing student

expression on the spirit rock. Ex. 14 at 1.

332. Ms. Hill did not respond to Mrs. Stout's email of September 19, 2025, nor did any other District employee respond on her behalf.

333. On September 30, 2025, Mrs. Stout sent Ms. Hill another email, copying the members of Defendant. A true, accurate, and complete copy of Mrs. Stout's email to Ms. Hill on September 30, 2025, along with subsequent replies, is attached to this Complaint as Exhibit 15.

334. In this email, Mrs. Stout recounted her prior efforts to contact Ms. Hill, Ms. Hill's failure to respond, and the type of public statement Mrs. Stout and her family wanted Defendant's officials to issue. Ex. 15 at 3.

335. In her email, Mrs. Stout expressed her and her family's disappointment that Defendant and its officials had not yet acknowledged that G.S. and her friends did nothing wrong when they painted the spirit rock after receiving permission from the school to do so. Ex. 15 at 3.

336. On October 2, 2025, Mr. Stout, Mrs. Stout, and G.S. spoke with Ms. Bostic. Ex. 15 at 1.

337. In this conversation, Ms. Bostic stated that she had spoken with Ms. Nichols and that Ms. Nichols had closed out her investigation into G.S.'s efforts to paint the spirit rock.

338. Mrs. Stout reiterated her request that Defendant's officials issue a public statement exonerating G.S. and her friends, noting that G.S. and her friends were still perceived in the school community as guilty of misconduct.

339. Ms. Bostic claimed that G.S.'s message on the spirit rock was a "hot topic" and a "political message."

340. Mr. and Mrs. Stout corrected her, noting that G.S. was not attempting to spread a political message when she painted the spirit rock.

341. Mr. and Mrs. Stout noted that no district or school official had ever asked

G.S. or her friends why they painted the spirit rock or what message they were trying to convey, but instead, these officials jumped to conclusions, publicly accusing G.S. and her friends of being policy-violating vandals.

342. Mrs. Stout then asked Ms. Bostic if Defendant's officials would issue any public statement clearing G.S. and her friends of any wrongdoing.

343. Ms. Bostic responded: "The District does not intend to take any more action."

344. Mr. Stout highlighted for Ms. Bostic the abuse G.S. and her friends had endured from other students and the public due to District officials' public accusations of wrongdoing, including criminal wrongdoing, noting that G.S. and her friends had been called "fascists," "white supremacists," "LGBTQ-haters," and more.

345. Mr. Stout emphasized to Ms. Bostic that Ms. Nichols' email of September 14—written in concert with other District officials—fueled the abuse G.S. and her friends experienced and expressed his frustration at the unwillingness of Defendant's officials to "untangle that mess."

346. Mrs. Stout then highlighted how Ms. Nichols' email of September 14 should never have been sent, how it had a very destructive effect, and how it sought to create fear in the minds of everyone involved in G.S.'s effort to paint the spirit rock. She proceeded to explain how absurd it was to launch a criminal investigation into students who had permission to paint the spirit rock, especially in light of all the other forms of misconduct that occur so frequently at Ardrey Kell High School.

347. Mr. Stout also expressed his frustration that Defendant's officials would not have followed up with his family had not Mrs. Stout sent repeated emails to Ms. Hill.

348. After hearing all this, Ms. Bostic said nothing and the conversation ended.

349. Through this conversation, Ms. Bostic made it very clear that Defendant's officials would not issue any public statement exonerating G.S. and her friends from the public accusations of wrongdoing those officials had leveled at them, even though those officials had since agreed that G.S. and her friends had done nothing wrong.

41

350. After this, Ms. Bostic summarized the content of her conversation with Mr. and Mrs. Stout for Ms. Hill.

351. In the afternoon of October 2, 2025, Ms. Hill emailed Mrs. Stout, acknowledging that the conversation with Ms. Bostic did not resolve Mr. and Mrs. Stout's concerns and promising to follow up with Mrs. Stout by "next Friday" after conducting a "thorough review." Ex. 15 at 1.

352. On October 3, 2025, Mrs. Stout responded to Ms. Hill, pointing out that Ms. Nichols had concluded that G.S. and her friends had done nothing wrong by September 17, 2025, and asking why Ms. Hill still needed to review this situation. A true, accurate, and complete copy of Mrs. Stout's email to Ms. Hill on October 3, 2025— which continues the email string in Exhibit 15 and includes Ms. Hill's response—is attached to this Complaint as Exhibit 16.

353. On October 7, 2025, Ms. Hill emailed Mrs. Stout, claiming that she had received "some information that required further review" and again promising to follow up "later this week." Ex. 16 at 2.

354. On October 10, 2025, Ms. Hill emailed Mrs. Stout again, claiming that Ms. Nichol's message of September 14 (*i.e.*, Ex. 7) was not accurate and promising that a "clarifying message" would be sent "later this weekend." Ex. 16 at 1.

355. At no time has Defendant or any of its officials issued a public statement exonerating G.S. and her friends from the public accusations of misconduct leveled at them on September 14, 2025, even though all District officials have concluded that G.S. and her friends did nothing wrong.

## IX. Finally, Defendant and its officials issued false statements denying their actions.

356. On October 11, 2025, Defendant—through Charlotte-Mecklenburg Schools Communications Division—sent a message to all families of Ardrey Kell High School students. A true, accurate, and complete copy of Defendant's statement is attached to

this Complaint as Exhibit 17.

357. Charlotte-Mecklenburg Schools Communications Division prepared this statement in consultation with and with the approval of Ms. Hill, Ms. Medlock, Mr. Boone, Ms. Balknight, Ms. Bostic, Ms. Nichols, Ms. Holden, Ms. Hitt, and Ms. Dugan.

358. Charlotte-Mecklenburg Schools Communications Division sent this statement at the direction of Defendant, Ms. Hill, Ms. Medlock, Mr. Boone, Ms. Balknight, Ms. Bostic, and Ms. Nichols, as well as the offices they represent.

359. In this statement, Defendant sought to revise Ms. Nichol's message of September 14 (*i.e.*, Ex. 7).

360. In this statement, Defendant states: "The incident in question **was not** an act of vandalism." Ex. 17 at 1.

361. While accurate, this statement does not change the fact that Defendant and its officials treated G.S.'s expression as an act of vandalism and publicly accused her of vandalism. *See* Ex. 7 at 1.

362. In this statement, Defendant also states: "The incident **was not** a violation of the student code of conduct." Ex. 17 at 1.

363. While accurate, this statement does not change the fact that Defendant and its officials treated G.S.'s expression as a violation of their student code of conduct and publicly accused her of violating that code. *See* Ex. 7 at 1.

364. In this statement, Defendant also states: "Law enforcement **was not** contacted to conduct an investigation." Ex. 17 at 1.

365. On information and belief, Defendant's assertion that it did not contact law enforcement to investigate G.S. is false. *See* Ex. 7 at 1.

366. This statement does not change the fact that Defendant's officials compelled G.S. to prepare a written statement summarizing her rock-painting efforts and searched her phone to corroborate her account—all without advising her of her constitutional rights.

367. This statement also contradicts Defendant's statements elsewhere. District officials, for example, told reporters that Defendant's officials did contact law enforcement over G.S.'s rock-painting expression. *See* James Farrell, *CMS Says No Criminal Investigation of Ardrey Kell Spirit Rock Painting*, WFAE (Sept. 17, 2025), a true, accurate, and complete copy of which is attached to this Complaint as Exhibit 18 ("But on Wednesday, CMS clarified that while law enforcement was contacted....").

368. In this statement, Defendant claimed: "The incident did cause a disruption within our school community." Ex. 17 at 1.

369. In reality, G.S. simply painted the Ardrey Kell High School spirit rock to express her views. Defendant's officials, through their censorship and public accusations of wrongdoing, stoked a backlash against G.S, for which Defendant, in this statement, seeks to blame her.

370. In this statement, Defendant cites alleged "disruption" as the reason for adopting and enforcing their *Revised Spirit Rock Speech Code*. Ex. 17 at 1. This statement falsely claims that G.S. created a disruption.

371. On information and belief, Defendant issued its October 11, 2025, statement to articulate pretextual obfuscations to conceal from the public their efforts to investigate G.S. for her speech and to justify their efforts to unconstitutionally restrict the speech of students, including G.S.

X.   **Later, Defendant and its officials facilitated a political protest where students walked out of class to express their political views.**

372. In November 2025, the United States Department of Homeland Security conducted a series of operations in the Charlotte area aimed at enforcing federal immigration laws.

373. These operations impacted the District, as, by some estimates, as many as 30,000 students were absent from school on a single day in mid-November.

374. On information and belief, Defendant and its officials took no action against

any of the students who skipped school due to the immigration enforcement operations.

375. These immigration enforcement operations also became the subject of considerable public debate, both in the Charlotte area and in the nation more broadly.

376. On November 24, 2025, a group of students at Ardrey Kell High School decided to express their opposition to these immigration enforcement operations by walking out of class.

377. In walking out of class as part of this protest, these students were expressing their political views, particularly their opposition to the policies of the Trump administration.

378. Though this protest would disrupt the educational environment, Defendant and its officials chose to facilitate the students' expression of their political views.

379. On November 21, 2025, Ms. Nichols sent an electronic message via Parent-Square to the families of all Ardrey Kell High School students. A true, accurate, and complete copy of Ms. Nichol's November 21 message is attached to this Complaint as Exhibit 19.

380. In this message, Ms. Nichols informed all recipients that she had approved a student-led protest of the immigration enforcement operations in the Charlotte area and that it would occur on November 24, 2025. Ex. 19 at 1.

381. Ms. Nichols highlighted: "I have been working directly with five student leaders to ensure this event is organized...." Ex. 19 at 1.

382. Ms. Nichols went on to instruct the families of all students on how students could participate in the walk-out. Ex. 19 at 1.

383. Ms. Nichols then observed: "We are proud to support your right to expression...." Ex. 19 at 1.

384. Ms. Nichols concluded her message by addressing the student who organized this event and would participate in it: "Thank you for demonstrating leadership and a commitment to conducting yourselves in a manner that reflects the maturity and

45

respect we expect from all our students." Ex. 19 at 2.

385. By sending out this message, Ms. Nichols promoted and advertised the student walk-out protest to all families at Ardrey Kell High School.

386. By sending out this message, Ms. Nichols implicitly urged students to participate by giving them detailed instructions on how to do so, by expressing support for the walk-out protest, and by complimenting the students who chose to participate.

387. On November 24, 2025, Ms. Nichols sent an electronic message via ParentSquare to the families of all Ardrey Kell High School students. A true, accurate, and complete copy of Ms. Nichol's November 24 message is attached to this Complaint as Exhibit 20.

388. Ms. Nichols began her message by acknowledging that the student walk-out protest occurred that day. Ex. 20 at 1.

389. Next, Ms. Nichols noted that school "staff worked closely with student leaders to ensure that the event was conducted safely and respectfully." Ex. 20 at 1.

390. Ms. Nichols went on to say that she and other school officials "appreciate students expressing their views in ways that follow school procedures." Ex. 20 at 1.

391. Ms. Nichols' two messages in November (*i.e.*, Exs. 19 and 20) stand in stark contrast to how Defendant and its officials (including Ms. Nichols) responded to G.S.'s efforts to express her views.

392. Like the walk-out protest Defendant and its officials facilitated, G.S.'s efforts to paint the Ardrey Kell High School spirit rock were a "student-led activity planned and approved." Ex. 19 at 1. *See supra* Part II.

393. Like the walk-out protest Defendant and its officials facilitated, G.S.'s efforts to paint the Ardrey Kell High School spirit rock represented "student voices" who sought to engage in "civic expression." Ex. 19 at 1. *See supra* Part II.B.

394. Like the walk-out protest Defendant and its officials facilitated, G.S.'s efforts to paint the Ardrey Kell High School spirit rock were "organized, safe, and respectful

for everyone." Ex. 19 at 1. *See supra* Part II.B.

395. But unlike the walk-out protest, G.S.'s civic expression did not disrupt the educational instruction of students at Ardrey Kell High School during the middle of a school day, as it took place on a Saturday. *See supra* Part II.B.

396. Unlike the walk-out protest, Defendant and its officials did not promote and advertise G.S.'s efforts to paint the Ardrey Kell High School spirit rock. Ex. 19 at 1. *See supra* Parts III–IX.

397. Unlike the walk-out protest, Defendant and its officials did not highlight to the entire school community how they "support[ed] [G.S.'s] right to expression." Ex. 19 at 1. *See supra* Parts III–IX.

398. Unlike the walk-out protest, Defendant and its officials did not compliment G.S. for "demonstrating leadership" and "maturity" in how she expressed her views, even though they had approved her efforts. Ex. 19 at 2. *See supra* Parts III–IX.

399. Instead, Defendant and its officials censored G.S.'s speech, publicly accused her of a crime and of a student conduct violation, forced her to provide evidence in a criminal investigation, devised policies to restrict her speech in the future, and refused to exonerate her publicly even after they all concluded that she had done nothing wrong. *See supra* Parts III–IX.

400. In short, Defendant and its officials facilitate political expression from students when it aligns with their predominantly left-leaning views. But when students express religious views that Defendant and its officials do not share, they censor that expression, retaliate against the students who dare to express it, and adopt policies designed to stifle and punish it.

## STATEMENTS OF LAW

401. At all times relevant to this Complaint, each and all of the acts and policies alleged herein were attributed to Defendant which acted under color of a statute, regulation, or custom of the State of North Carolina (*i.e.*, under color of state law and

authority).

402. Defendant knew or should have known that it was violating G.S.'s constitutional rights by censoring her tribute to Charlie Kirk on the Ardrey Kell High School spirit rock, by publicly accusing G.S. of vandalism and violating the student code of conduct because she painted the Ardrey Kell High School spirit rock, by compelling G.S. to provide a written statement about her rock-painting efforts without advising her of her constitutional rights, by searching her cell phone, by refusing to clear G.S.'s name, and by adopting viewpoint-based policies to restrict G.S.'s speech in the future.

403. G.S. challenges Defendant's *Unwritten Spirit Rock Speech Code* as applied.

404. G.S. challenges Defendant's *Vandalism Policy* as applied.

405. G.S. challenges Defendant's *Revised Spirit Rock Speech Code* facially and as applied.

406. The decisions and policies that led to the violation of G.S.'s constitutional rights remain in full force and effect.

407. G.S. has suffered and is suffering irreparable harm from Defendant's unconstitutional decisions and policies challenged here.

408. G.S. has no adequate or speedy remedy at law to correct the deprivation of her rights by Defendant.

409. Defendant's actions and policies, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

410. Defendant's unconstitutional decisions and policies are not narrowly tailored (or even reasonable) as applied to G.S. because G.S.'s expression does not implicate any of the legitimate interests Defendant might have.

411. Unless the decisions of Defendant are enjoined, G.S. will continue to suffer irreparable injury.

412. Under 42 U.S.C. §§ 1983 and 1988, G.S. is entitled to appropriate relief invalidating Defendant's challenged policies and decisions.

**FIRST CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Content & Viewpoint Discrimination**
**(42 U.S.C. § 1983)**

413. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

414. By censoring G.S.'s speech on the Ardrey Kell High School spirit rock and then accusing G.S. of (and investigating her for) potential criminal and student conduct violations, Defendant engaged in content and/or viewpoint discrimination in violation of the First Amendment.

415. Defendant's officials evaluated the content and viewpoint of G.S.'s speech on the Ardrey Kell High School spirit rock to determine whether they would censor her speech and whether they would accuse her of and investigate her for potential criminal and student conduct violations.

416. Defendant's officials considered the content and viewpoint of G.S.'s expression when they decided to take adverse actions against her.

417. Defendant's officials retained unbridled discretion under Defendant's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* to discriminate based on content or viewpoint.

418. Defendant's officials exercised this unbridled discretion when they censored G.S. for expressing her views on the Ardrey Kell High School spirit rock and when they accused her of and investigated her for potential criminal and student conduct violations.

419. Defendant's retaliatory and unconstitutional actions taken against G.S. under its *Unwritten Spirit Rock Speech Code* and its *Vandalism Policy* are unconstitu-

tionally overbroad because they restrict a significant amount of constitutionally protected speech.

420. The overbreadth of Defendant's retaliatory and unconstitutional actions taken against G.S. chills the speech of G.S., who seeks to engage in protected expression on campus.

421. G.S.'s expression regarding Charlie Kirk, her patriotic views, and her religious beliefs on the Ardrey Kell High School spirit rock is speech that the First Amendment protects.

422. By taking adverse actions against G.S.—including censoring her speech and accusing her of and investigating her for potential criminal and student conduct violations—Defendant and its officials have punished her for engaging in expression the First Amendment protects.

423. Defendant's retaliatory and unconstitutional actions taken against G.S. violate her right to free speech as guaranteed by the First Amendment to the United States Constitution.

424. By prohibiting G.S. from expressing religious messages on the Ardrey Kell High School spirit rock under their *Revised Spirit Rock Speech Code*, Defendant and its officials are engaging in content and/or viewpoint discrimination in violation of the First Amendment.

425. Defendant and its officials must evaluate the content and viewpoint of student speech to determine whether it violates their *Revised Spirit Rock Speech Code* and thus can be prohibited.

426. Defendant and its officials retain unbridled discretion to discriminate based on content or viewpoint under their *Revised Spirit Rock Speech Code*.

427. Defendant and its officials exercise this unbridled discretion every time they permit students to express messages on the Ardrey Kell High School spirit rock (or prohibit them from doing so).

428. Defendant's and its officials' unconstitutional actions taken to enforce and implement their *Revised Spirit Rock Speech Code* are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

429. The overbreadth of Defendant's *Revised Spirit Rock Speech Code* chills the speech of G.S., who seeks to engage in protected expression on campus.

430. G.S.'s expression regarding Charlie Kirk, her patriotic views, and her religious beliefs on the Ardrey Kell High School spirit rock is speech that the First Amendment protects but is prohibited under Defendant's *Revised Spirit Rock Speech Code*.

431. By adopting, implementing, and enforcing their *Revised Spirit Rock Speech Code*, Defendant and its officials are prohibiting expression that the First Amendment protects.

432. Defendant's *Revised Spirit Rock Speech Code* violates G.S.'s right to free speech as guaranteed by the First Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION
**Violation of Plaintiff's Fourteenth Amendment Right to
Due Process of Law
(42 U.S.C. § 1983)**

433. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

434. By punishing G.S. under the vague and overbroad standards of its *Unwritten Spirit Rock Speech Code* and its *Vandalism Policy*—including by censoring G.S.'s expression on the Ardrey Kell High School spirit rock and then accusing her of and investigating her for potential criminal and student conduct violations—Defendant and its officials have violated G.S.'s right to due process of law under the Fourteenth Amendment.

435. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. under their *Unwritten Spirit Rock Speech Code* and their *Vandalism*

*Policy* are overbroad because they encompass a substantial amount of constitutionally protected speech.

436. G.S.'s expression regarding Charlie Kirk, her patriotic views, and her religious beliefs on the Ardrey Kell High School spirit rock is speech that the First Amendment protects.

437. By taking adverse actions against G.S.—including censoring her speech and accusing her of and investigating her for potential criminal and student conduct violations—Defendant and its officials have punished her for engaging in expression the First Amendment protects.

438. Defendant's and its official's adverse actions against G.S. under Defendant's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy*—including censoring G.S.'s expression on the Ardrey Kell High School spirit rock and then accusing her of and investigating her for potential criminal and student conduct violations—are unconstitutionally vague because (i) they grant Defendant and its officials unbridled discretion in deciding which viewpoints may be expressed on the Ardrey Kell High School spirit rock without risking one's freedom or status as a student in good standing, (ii) those decisions rely on assessments that are inherently subjective and elude any precise or objective measurement that would be consistent from one official to another, (iii) those inherently subjective assessments are inherently incapable of providing meaningful guidance to Defendant or its officials, and (iv) they force students to guess whether expression that the First Amendment protects is in fact allowed on campus.

439. The lack of objective criteria, factors, or standards in Defendant's and its officials' adverse actions under their *Unwritten Spirit Rock Speech Code* and their *Vandalism Policy* renders those actions unconstitutionally vague and in violation of G.S.'s right to due process of law under the Fourteenth Amendment to the United States Constitution.

440. By prohibiting speech on the Ardrey Kell High School spirit rock under vague and overbroad standards of their *Revised Spirit Rock Speech Code*, Defendant and its officials have violated and are violating G.S.'s right to due process of law under the Fourteenth Amendment.

441. Defendant's *Revised Spirit Rock Speech Code* and its officials' actions taken to enforce it are overbroad because they encompass a substantial amount of constitutionally protected speech.

442. G.S.'s expression regarding Charlie Kirk, her patriotic views, and her religious beliefs on the Ardrey Kell High School spirit rock is speech that the First Amendment protects but is prohibited under Defendant's *Revised Spirit Rock Speech Code*.

443. By adopting their *Revised Spirit Rock Speech Code*, Defendant and its officials are restricting students from engaging in expression the First Amendment protects.

444. Defendant's *Revised Spirit Rock Speech Code* and its officials' actions taken to enforce it prohibit G.S. from engaging in constitutionally protected expression in violation of her right to due process of law under the Fourteenth Amendment.

445. Defendant's *Revised Spirit Rock Speech Code* is unconstitutionally vague because it grants Defendant and its officials unbridled discretion to decide what viewpoints students can express on the Ardrey Kell High School spirit rock, because its terms require Defendant and its officials to make assessments that are inherently subjective and elude any precise or objective measurement that would be consistent from one official to another, because its terms are incapable of providing meaningful guidance to Defendant and its officials, and because they force students to guess whether expression that the First Amendment protects is in fact allowed on campus.

446. The lack of objective criteria, factors, or standards in Defendant's *Revised Spirit Rock Speech Code* renders this policy and any actions taken to enforce it unconstitutionally vague and in violation of G.S.'s right to due process of law under the Fourteenth Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Free Speech
### Retaliation
### (42 U.S.C. § 1983)

447. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

448. By punishing G.S. for expressing her views regarding Charlie Kirk, her patriotic feelings, and her religious beliefs on the Ardrey Kell High School spirit rock through the retaliatory actions mentioned above—including censoring her expression and then accusing her of and investigating her for criminal and student conduct violations—Defendant and its officials have retaliated and are retaliating against G.S. for exercising his First Amendment rights.

449. When G.S. communicated her views regarding Charlie Kirk, her patriotic views, and her religious beliefs on the Ardrey Kell High School spirit rock, she engaged in expression that the First Amendment protects.

450. G.S.'s speech on the Ardrey Kell High School spirit rock created no disruption at the high school.

451. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. would deter a person of ordinary firmness from exercising her right to free speech in the future.

452. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. are actions that adversely affect her First Amendment rights.

453. Defendant and its officials took these retaliatory and unconstitutional actions against G.S. because of the views she expressed on the Ardrey Kell High School spirit rock, expression that the First Amendment protects.

454. Defendant and its officials subjected G.S. to adverse actions due to the content and viewpoint of her speech.

455. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. violate her right to free speech as guaranteed by the First Amendment

to the United States Constitution.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Free Exercise of Religion**
**(42 U.S.C. § 1983)**

456. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

457. By censoring G.S., accusing her of criminal and student conduct violations, investigating her for the same, and threatening to punish her for the same because she expressed her sincerely held religious beliefs on the Ardrey Kell High School Spirit Rock, Defendant and its officials have violated her right to free exercise of religion under the First Amendment.

458. G.S.'s views and expression on the Ardrey Kell High School spirit rock were motivated by her sincerely held religious beliefs, are avenues through which she expressed her religious faith, and constitute a central component of her sincerely held religious beliefs.

459. By censoring G.S.'s expression of her sincerely held religious beliefs on the Ardrey Kell High School spirit rock and then accusing her of criminal and student conduct violations and investigating her for the same, Defendant and its officials demonstrated hostility towards G.S.'s religious beliefs and expression, violating the First Amendment.

460. Defendant's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, *Revised Spirit Rock Speech Code,* and related practices are neither neutral nor generally applicable but allow Defendant and its officials to target religious expression and activities specifically and to express hostility to such expression.

461. Defendant's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, *Revised Spirit Rock Speech Code,* and related practices are neither neutral nor generally applicable because they represent a system of individualized assessments.

462. Defendant's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, *Revised*

55

*Spirit Rock Speech Code,* and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to Defendant's asserted interests unprohibited.

463. Defendant's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, *Revised Spirit Rock Speech Code,* and related practices burden several of G.S.'s constitutional rights—including her First Amendment rights (*i.e.*, freedom of speech, freedom from retaliation, free exercise of religion), her Fourth and Fifth Amendment rights, the unconstitutional conditions doctrine, and the Fourteenth Amendment (*e.g.*, due process and equal protection).

464. Defendant and its officials violated G.S.'s right to free exercise of religion when they applied Defendant's *Unwritten Spirit Rock Speech Code* and its *Vandalism Policy* to censor G.S.'s expression of her religious beliefs on the Ardrey Kell High School spirit rock, when they accused her of criminal and student conduct violations for expressing her beliefs, and when they investigated her for expressing those beliefs.

465. Defendant's *Unwritten Spirit Rock Speech Code*, its *Vandalism Policy*, and its enforcement of both violated G.S.'s right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

466. By prohibiting religious expression on the spirit rock under their *Revised Spirit Rock Speech Code* and threatening to punish students, including G.S., who engage in that expression, Defendant and its officials have violated and are violating G.S.'s right to free exercise of religion under the First Amendment.

467. When G.S. expresses her religious views on the Ardrey Kell High School spirit rock, her expression is motivated by her sincerely held religious beliefs, is an avenue through which she expresses her religious faith, and constitutes a central component of her sincerely held religious beliefs.

468. By prohibiting religious expression Ardrey Kell High School spirit rock and then threatening to punish students, including G.S, who engage in such expression

under their *Revised Spirit Rock Speech Code*, Defendant and its officials have demonstrated and are demonstrating hostility towards G.S.'s religious beliefs and expression, violating the First Amendment.

469. Defendant and its officials violated G.S.'s right to free exercise of religion when they adopted, promulgated, and threatened to enforce their *Revised Spirit Rock Speech Code* to prohibit religious expression on the Ardrey Kell High School spirit rock, and they continue to do so by maintaining that policy and continuing to threaten to enforce it.

470. Defendant's *Revised Spirit Rock Speech Code* and its officials' enforcement of that policy violate G.S.'s right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

### FIFTH CAUSE OF ACTION
### Violation of Plaintiff's Fourth Amendment Right to Be Free
### from Unreasonable Searches & Seizures
### (42 U.S.C. § 1983)

471. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

472. Defendant and its officials violated G.S.'s Fourth Amendment right to be free from unreasonable searches and seizures when they forced her into a room to write a statement about her efforts to paint the Ardrey Kell High School spirit rock after they had initiated a criminal investigation and when they searched her cell phone's log of phone calls as part of that investigation.

473. Before taking these actions, Defendant and its officials did not advise G.S. of her constitutional rights during any criminal investigation, as outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966), or obtain a search warrant.

474. Before taking these actions, Defendant and its officials did not secure knowing and voluntary consent from G.S. or her parents.

475. Taking these actions was objectively unreasonable, as Defendant and its officials knew or should have known that G.S. violated no criminal statute or student conduct regulation by painting a spirit rock that other students paint regularly without being disciplined or accused of a crime. Thus, their accusations and investigation were not justified at their inception, and their search of G.S.'s phone was not reasonable, seeing as the investigation had no legitimate basis from the outset.

476. Defendant's and its officials' actions in forcing G.S. to write this statement and allow them to search her cell phone violate her right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution.

### SIXTH CAUSE OF ACTION
### Violation of Plaintiff's Fifth Amendment Right Against Self-Incrimination
### (42 U.S.C. § 1983)

477. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

478. By forcing G.S. to write a statement regarding her efforts to paint the Ardrey Kell High School spirit rock after they had initiated a criminal investigation, Defendant and its officials violated her right against self-incrimination under the Fifth Amendment.

479. When they forced G.S. to write a statement regarding her efforts to paint the Ardrey Kell High School spirit rock, Defendant and its officials were participating in the criminal investigation they had announced that they were cooperating with, an investigation into whether G.S and her friends had committed the crime of vandalism when they painted the spirit rock.

480. Before taking these actions, Defendant and its officials did not advise G.S. of her constitutional rights during any criminal investigation, as outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966).

481. Defendant and its officials knew or should have known that they could not

force G.S. to testify against herself in any criminal proceeding before they forced her to write this statement while their criminal investigation was underway.

482. Defendant's and its officials' actions in forcing G.S. to write this statement violate her right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution.

SEVENTH CAUSE OF ACTION
**Violation of Plaintiff's Right to be Free from Unconstitutional Conditions
(42 U.S.C. § 1983)**

483. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

484. By conditioning G.S.'s right to express her views on the Ardrey Kell High School spirit rock on her complying first with Defendant's *Unwritten Spirit Rock Speech Code* and *Vandalism Policy* and later with Defendant's *Revised Spirit Rock Speech Code*, Defendant and its officials have imposed and are imposing an unconstitutional condition on her in violation of her First Amendment rights.

485. By forcing G.S. to write a mandated statement and allow its officials to search her cell phone to remain a student in good standing, Defendant imposed an unconstitutional condition on her in violation of her Fourth and Fifth Amendment rights.

486. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. impose an unconstitutional condition upon students' constitutional rights—including their rights to free speech, to freedom from unreasonable searches and seizures, and to freedom from self-incrimination—and their receipt of state benefits (*e.g.*, avoiding disciplinary actions up to and including expulsion and criminal sanctions).

487. Defendant and its officials required G.S. to surrender her constitutionally protected rights to freedom of speech, freedom from unreasonable searches and seizures, freedom from self-incrimination, right to due process of law, and equal protec-

59

tion to avoid disciplinary actions up to and including expulsion and criminal sanctions.

488. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. violate her right to be free from unconstitutional conditions.

**EIGHTH CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Equal Protection of the Law**
**(42 U.S.C. § 1983)**

489. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–412 of this Complaint.

490. By punishing G.S. for expressing her views regarding current events and her religious beliefs when they do not and would not punish students who express differing views on those same subjects, Defendant and its officials have violated and are violating G.S.'s right to equal protection of the law under the Fourteenth Amendment.

491. G.S. is similarly situated to other students at Ardrey Kell High School and in the District.

492. Defendant and its officials take no adverse actions against students who use the Ardrey Kell High School spirit rock to express their support for Black Lives Matter, recently fired principals, or religious admonitions (*e.g.*, "Be kind"), but they take adverse employment action against students, like G.S., who use the same rock to express their admiration for Charlie Kirk, their patriotism, and their religious belief that Jesus Christ provides eternal life to those who believe in Him.

493. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. have also discriminated intentionally against G.S.'s rights to freedom of speech, right to be free from unreasonable searches and seizures, right to be free from self-incrimination, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

494. Defendant's and its officials' retaliatory and unconstitutional actions taken

against G.S. burden G.S.'s fundamental rights and have no rational basis.

495. Defendant's and its officials' retaliatory and unconstitutional actions taken against G.S. are underinclusive, prohibiting some expression while leaving other expression equally harmful to Defendant's asserted interests unprohibited.

496. Defendant and its officials took adverse actions against G.S. in a discriminatory and unequal manner, granting other students the right to express their views current events and religious beliefs on the Ardrey Kell High School spirit rock while denying that right to G.S., in violation of G.S.'s right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, G.S. respectfully requests that this Court enter judgment against Defendant and provide her with the following relief:

A. A declaratory judgment that Defendant's *Unwritten Spirit Rock Speech Code*, *Vandalism Policy*, and *Revised Spirit Rock Speech Code,* and the unconstitutional actions against G.S. pursuant to it—including censoring her speech, publicly accusing her of misconduct, searching her cell phone, refusing to clear her name, and adopting a new viewpoint-based policy—violated her rights under the First, Fourth, Fifth, and/or Fourteenth Amendments;

B. A preliminary and permanent injunction barring Defendant, its agents, officials, servants, employees, and any other persons acting on its behalf from enforcing its *Vandalism Policy* to restrict or punish student expression on the Ardrey Kell High School spirit rock;

C. A preliminary and permanent injunction barring Defendant, its agents, officials, servants, employees, and any other persons acting on its behalf from enforcing its *Revised Spirit Rock Speech Code*.

D. An order requiring Defendant to remove any negative information relating to the investigation from her student records and issue a letter of apology.

E. Nominal and compensatory damages for the violation of G.S.'s First, Fourth, Fifth, and Fourteenth Amendment rights;

F. G.S.'s reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

G. All other further relief to which G.S. may be entitled.

Respectfully submitted this 8th day of December, 2025.

/s/ Travis C. Barham
_____

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

TYSON C. LANGHOFER*
Arizona Bar No. 032589
MATTHEW C. RAY*
Virginia Bar No. 100510
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–4655
Facsimile: (571) 707–4790
tlanghofer@ADFlegal.org
mray@ADFlegal.org

CRAIG D. SCHAUER
North Carolina Bar No. 41571
**DOWLING PLLC**
3801 Lake Boone Trail, Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529–3351
Facsimile: (919) 651–4439
cschauer@dowlingfirm.com

*Local Counsel under LCvR 83.1*

**\* *Pro hac vice* motions forthcoming.**

*Attorneys for Plaintiffs*

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable herein.

/s/ Travis C. Barham
_____

TRAVIS C. BARHAM
*Attorney for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, G.S., a citizen of the United States and a resident of the State of North Carolina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this _4th_ day of December, 2025, at Charlotte, North Carolina.

G.S.

## DECLARATION UNDER PENALTY OF PERJURY

I, STEVEN STOUT, a citizen of the United States and a resident of the State of North Carolina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this _4th_ day of December, 2025, at Charlotte, North Carolina.

STEVEN STOUT

### Declaration Under Penalty of Perjury

I, Kristin Stout, a citizen of the United States and a resident of the State of North Carolina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this _4th_ day of December, 2025, at Charlotte, North Carolina.

_____
Kristin Stout